

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| TONY EGBUNA FORD, | § | |
| **Petitioner,** | § | |
| | § | |
| v. | § | |
| | § | EP-01-CA-0386-DB |
| JANIE COCKRELL, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Tony Egbuna Ford filed this federal habeas corpus petition pursuant to 28

U.S.C. § 2254, in which he attacks his otherwise final state capital murder conviction and death

sentence.  After careful consideration, the Court concludes that Ford's claims are either

procedurally barred or without merit under the Antiterrorism and Effective Death Penalty Act of

1996.  Accordingly, the Court concludes that Ford is not entitled to federal habeas relief.

## I.   FACTS AND PROCEDURAL HISTORY

*A.  Facts of the Offense*

After reviewing the entire record, the Court finds that it supports the Texas Court of

Criminal Appeals' rendition of the facts:

> On December 18, 1991, the Murillo family attended a Christmas play to
> see their cousin perform.  At the conclusion of the play the family departed to
> their mother's, Myra Concepcion Murillo's, home for a quick dinner.  The mother
> and her three children, Myra Magdalena, Armando, and Lisa, all planned to do
> some Christmas shopping later that evening. After dinner, Armando was in the
> family room watching television, Myra Magdalena was readying herself in her
> bedroom for her shopping trip, and  Lisa was in the kitchen.  Their mother called
> out to her children at some point to inquire if any had heard the two men who had
> knocked at the door.  The two men were apparently looking for "the man of the
> house" and the mother had refused to permit their entrance. After the children
> informed her that they had heard nothing, each returned to his or her previous
> task.

Moments later Myra Magdalena stepped out into the hallway to encourage her family to hurry up. At that moment, she saw her mother and her brother retreating from the doorway. Her mother was backing up as if she was in fear for her life, kind of crouching down, and her brother looked as if he had been hit in the head and just huddled straight into the corner. She testified that within a few seconds, she saw [Ford] standing to her right, next to her at the entry to her bedroom. Subsequently she saw his cohort. She testified that both had guns. Lisa testified that she "heard a barging in, just a lot of noise, racket, like someone kicking wood." She saw two strangers in the hallway with guns. Ford's cohort pointed a gun at Lisa and walked her into the den area.

[Ford] and his cohort ordered the four individuals to kneel on the floor and to be quiet. The Murillos began to pray. [Ford] first demanded money, then jewelry. Throughout these demands, [Ford] would yell and threaten the family, occasionally pausing to strike Armando with the gun. Recognizing [Ford's] cohort as "a very familiar face in the neighborhood," Myra Magdalena attempted to divert her gaze away from the cohort to prevent being recognized. The four continued to pray as they were asked to remove their jewelry. Finally, [Ford] asked for the keys to the car parked outside. When Myra Magdalena hesitated in releasing her automobile keys, her sister retrieved them and awkwardly threw them towards [Ford]. The keys skinned his face and hit the wall. Myra Magdalena testified that [Ford's] response was, "[F]uck you, just for that, I was just going to blow him. Now I'm just going to fucking blow you all." She testified that [Ford] then began shooting.

[Ford] shot Armando in the back of the head. Myra Concepcion, upon seeing her son shot, jumped up to comfort Armando. [Ford] hooked his arm around her and shot her on the right side of the head. Myra Magdalena testified that [Ford] had to curve his gun around to aim it properly at her mother's head before he shot her. Upon being shot in the head at point blank range, Myra Concepcion fell to floor. Myra Magdalena believed that she would be next. As [Ford] stepped toward her, Myra Magdalena rose and pushed him. The gun discharged and she fell to the ground pretending to be hit. The bullet had missed her. Another shot went off and she heard her sister "gulp." After the robbers left, Myra Magdalena got up and phoned for help. Armando died from the gunshot wound. The others survived. [Ford] was identified as doing the shooting, and as being dominating, doing most of the talking and giving the most orders.[1]

The record also supports the Court of Criminal Appeals' summation of the evidence

presented at the punishment phase:

---

[1]*Ford v. State*, 919 S.W.2d 107, 109-10 (1996).

Ford testified at guilt/innocence and at punishment. He steadfastly denied participating in the home invasion and shooting, but rather insisted that he had remained outside, initially sitting in the vehicle, but then getting out, while two associates entered the home and committed the offense. He maintained that he did not shoot or kill anybody.

At punishment, neither the State nor [Ford] presented any psychiatric or psychological testimony. The State did not present any evidence of prior criminal record, unadjudicated offense, or bad character.[2] The State only presented testimony from the decedent's father, mother, and two sisters. They testified about the effect that the decedent's death and others' injuries was having on them. The State also presented exhibits, which were medical records of the two survivors.

[Ford's] mother testified that [Ford] was born on June 19, 1973, making him 18-years-old at the time of the offense. [Ford] also presented testimony from his sister, and three family friends who had known him for a number of years. They indicated that [Ford] previously had not exhibited any violence or acts of aggression, and opined that he would follow the rules and regulations of prison society, would take advantage of rehabilitation opportunities, and would not be a future danger if incarcerated for life. [Ford] himself testified at punishment and indicated that he could follow prison rules and regulations if incarcerated for life. He also cried on cross-examination, stating that he would not want what happened to the Murillos to happen to anybody, and acknowledging that he also felt bad that he was facing a possible death penalty. He added that "[e]verybody is a victim in this case[,]" including in some instances himself in that he did not agree with the jury's verdict because he did not do anything wrong besides sitting outside in the truck.[3]

After deliberating for approximately seven-and-a-half hours, the jury returned with its answers to the special questions required under Texas law.[4] It found beyond a reasonable doubt that: (1) there was a probability that Ford would commit criminal acts of violence that would constitute a continuing threat to society; and (2) Ford actually caused Armando Murillo's death, or if he did not actually cause Armando Murillo's death, that he intended to kill Armando

---

[2]The State stipulated that Ford had no felony conviction in Texas or any other State.

[3]*Ford v. State*, 919 S.W.2d at 110-11.

[4]*See* TEX. CODE CRIM. PROC. Art. 37.071 § 2(b).

3

Murillo or someone else, or he anticipated that a human life would be taken.  It further found that there was not sufficient mitigating circumstances to warrant life imprisonment rather than a death sentence.  Accordingly, the trial judge sentenced Ford to death.

### B. Procedural History

Ford was convicted of capital murder on July 13, 1993 and sentenced to death in the 364th Judicial District Court of El Paso County, Texas.[5]  His capital murder conviction was automatically appealed to the Texas Court of Criminal Appeals ("Court of Criminal Appeals"), which affirmed his conviction and sentence in a published opinion issued February 21, 1996. Ford did not file a petition for a writ of certiorari, but filed a state application for writ of habeas corpus on May 1, 1997.  The Court of Criminal Appeals adopted the trial court's findings of fact and conclusions of law and denied that petition on September 12, 2001.[6]  Ford then filed his original federal habeas corpus petition on October 23, 2001, followed by the instant Amended Petition on January 3, 2003.  In his Amended Petition, he asserts eleven claims for relief, arguing that:  (1) his trial counsel was ineffective; (2) his appellate counsel was ineffective; (3) the trial judge denied him due process by refusing to appoint an eyewitness identification witness; (4) an unduly suggestive lineup denied him due process; (5) the State suppressed evidence favorable to Ford; and (6) jury misconduct denied him due process and violated his Sixth Amendment right to confrontation.

---

[5]Ford and his co-defendant, Vanjamar ("Van") Belton were tried separately.  Van Belton, who was tried first, was found guilty of aggravated robbery with a deadly weapon and sentenced to sixty (60) years in prison. In addition to his conviction for the capital murder of Armando Murillo, Ford was also convicted of three counts of attempted capital murder.  He received three life sentences.

[6]Ex parte Ford, No. 49,011-01.

4

## II.   EXHAUSTION OF CLAIMS

### A. The Parties' Contentions

Respondent contends that Ford has failed to exhaust three of his claims in state court.[7]  In his first claim, Ford argues that his trial counsel was ineffective for losing his pre-trial motion to have an eyewitness identification expert, Dr. Rex Malpass ("Malpass"), appointed.  To support his claim, Ford presents a report from Malpass.[8]  Respondent argues that:

> [Malpass' instant] report and accompanying exhibits are more extensive than the bare-bones material from Malpass that Ford submitted on state habeas review.  *Ex parte Ford* at 162-64.  In particular, the studies concerning Ford's case on which he relies in this Court were not included in the report that he offered to the state courts.  Because Ford did not present all of the materials on which he now relies to the state courts, he has not exhausted his state remedies.  *Hart v. Estelle*, 634 F.2d 987, 989 (5th Cir. 1981).  If he were to file another state writ application including this material, it would be dismissed for abuse of writ under Section 5(a) of Article 11.071 of the Texas Code of Criminal Procedure, which forbids consideration of successive habeas petitions raising allegations for which the legal and factual basis previously was available.. . . [W]here the petitioner never has presented his claim to the state courts, it is procedurally barred in federal court "if it is clear that his claims are now procedurally barred under [state] law."  *Castille v. Peoples*, 489 U.S. 346, 351 (1989).[9]

Because Ford's unexhausted claim would be dismissed as an abuse of writ if presented in a subsequent state writ application, Respondent continues, his claim is consequently procedurally barred from review in his instant federal writ application.[10]  Respondent advances the same argument regarding Ford's sixth or *Brady*[11] claim, in which Ford alleges that the State suppressed

---

[7]Claims One, Six, and Eleven.

[8]*See* Pet'r Ex. 11.  Unless otherwise specified, all citations to exhibits refer to those included in Ford's Amended Petition.

[9]Resp't Orig. Answer at 13.

[10]*See id.*

[11]*Brady v. Maryland*, 373 U.S. 83 (1963).

evidence that was favorable to him.[12]  Respondent further argues that Ford never raised his

eleventh claim (that the jurors were tainted at the punishment phase by outside influences) in

state court and that it would now be procedurally barred.[13]

It is not clear whether Ford contends that he did exhaust his ineffective assistance claim

in state court. He does argue, however,  that taken together, his: (1) pre-state habeas application

request for funds with which to engage Malpass' services; and (2) renewed and amplified request

for funds made in the state habeas application itself presented all the information presented in his

request for funds made to this Court.[14]  Moreover, Ford contends, even if the Court were to find

that he did not exhaust his claim in state court and it is now subject to dismissal for procedural

default, he can nevertheless show cause and prejudice to overcome the procedural bar.[15]

Specifically, he argues that the reason Malpass' studies concerning Ford's case were not

presented in state habeas proceedings to the extent that they are in his federal habeas petition is

that the Court of Criminal Appeals and trial court denied his repeated requests for funds with

which to engage Malpass' services.[16]  Ford states that counsel requested funds for Malpass'

assistance before preparing his state habeas application, but was denied.[17]  Counsel proceeded to

prepare Ford's state habeas application; renewed and amplified his request for funds therein; and

---

[12]*See* Resp't Orig. Answer at 27.

[13]*See id.* at 32.

[14]*See* Pet'r Reply to Resp't Orig. Answer at 3.

[15]*See id.* at 2.

[16]*See id.*

[17]*See* Pet'r Reply to Resp't Orig. Answer at 2-3; *see also* Pet'r Ex. 1.

set out detailed claims based upon the trial court's denial of an eyewitness identification expert.[18]

In Ford's state habeas application, counsel explained that Malpass could conduct studies

concerning the photo lineup and the similarity in appearance between Victor Belton[19] and Tony

Ford, thereby questioning the suggestiveness of the photo lineup and the likelihood that the

Murillo sisters mistakenly identified Ford.  Counsel argues that he did all he could to develop

Ford's claim but was prevented from doing so by the actions of the state courts, and that Ford

cannot be faulted now for that omission.[20]

Regarding his sixth or *Brady* claim, Ford concedes that he has not exhausted his claim in

state court, but argues that he should be excused under the provisions of 28 U.S.C. §

2254(b)(1)(B)(ii)[21] because the facts underlying his claim "have been and continue to be

suppressed by the prosecution."[22]

Regarding Ford's eleventh claim, that the jury was tainted by an outside influence, Ford

concedes that he did not raise the claim in state court.[23]  He makes no other statement regarding

exhaustion or cause and prejudice.

---

[18]*See* Pet'r Reply to Resp't Orig. Answer at 2-3; *see also* Pet'r Ex. 3.

[19]Van Belton was also charged with the crimes that occurred at the Murillos' house.  His brother, Victor Belton, was arrested and charged with assaulting the officers who came to the Belton house to arrest Van. Ford contends that it was Victor Belton who, with Van, broke into the Murillo's home.

[20]*See* Pet'r Reply to Resp't Orig. Answer at 5.

[21]Under Title 28 U.S.C. § 2254(b)(1)(B)(ii), a federal court cannot review an unexhausted claim in a state prisoner's federal habeas petition unless: (1) no State corrective process exists; or (2) a State corrective process exists, but circumstances render "such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(B)(ii) (Thomson-West 2004).

[22]*See* Am. Pet. at 37 ¶ 1.

[23]*See id.* at 48.

*B. Legal Standard – Exhaustion of Claims under 28 U.S.C. § 2254*

Under 28 U.S.C. §§ 2254(b)(1)(A), a court shall *not* grant habeas relief unless "the

applicant has exhausted the remedies available in the courts of the State."[24]

> The requirements of the exhaustion concept are simple: An applicant must fairly apprise
> the highest court of his state of the federal rights which were allegedly violated. Further,
> the applicant must present his claims in a procedurally correct manner. If, for whatever
> reason, an applicant bypasses the appellate processes of his state - whether through
> procedural default or otherwise - he will *not* be deemed to have met the exhaustion
> requirement absent a showing of one of two particulars. He must either demonstrate
> cause and prejudice *or* show that the failure to consider his claims will result in a
> fundamental miscarriage of justice.[25]

Ford has satisfied the exhaustion requirement if he "fairly present[ed]" his issues to Texas

courts.[26]

To determine whether a claim has been fairly presented to state courts, the Supreme Court

has provided the following guidance:

> [F]or purposes of exhausting state remedies, a claim for relief in habeas corpus
> must include reference to a specific federal constitutional guarantee, as well as a
> statement of the facts that entitle the petitioner to relief. . . .We have also indicated
> that it is not enough to make a general appeal to a constitutional guarantee as
> broad as due process to present the "substance" of such a claim to a state court.[27]

---

[24]*Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir. 2001); *accord Baldwin v. Reese*, ___ U.S. ___, 124 S.Ct. 1347, 1349 (2004).

[25]*Beazley*, 242 F.3d at 263 (quoting *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993)).

[26]*Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (state courts must have an opportunity to hear and dispose of the same claim that the petitioner urges upon federal courts); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (petitioner must have fairly presented the substance of his claim to the state courts); *Wilson v. Foti*, 832 F.2d 891, 893-94 (5th Cir. 1987) (to have exhausted his state-court remedies, petitioner must have appealed his claims through to state's highest court); *Richardson v. Procunier*, 762 F.2d 429, 431-32 (5th Cir. 1985).

[27]*Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (citing *Picard v. Connor*, 404 U.S. 270, 271 (1971) and *Anderson v. Harless*, 459 U.S. 4, 7 (1982)).

"It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made."[28] "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."[29] Thus, Ford will have failed to exhaust his claims if he presents new legal theories or factual claims in his federal habeas petition which he failed to present in his state court appeal.[30] However, the presentation of supplemental evidence in a federal petition that "does not fundamentally alter the legal claim already considered by the state courts" does not render a claim unexhausted for procedural purposes.[31] "[W]hether evidence 'fundamentally alters' or merely 'supplements' the state petition is an inquiry that is, by necessity, case and fact specific."[32] The Fifth Circuit has stated that "substantial new evidence rising to the level of a '180 degree turn' renders a claim unexhausted."[33] In contrast, a federal petitioner will not have failed to exhaust his claim if the

_____

[28]*Wilder*, 274 F.3d at 259 (citing *Anderson v. Harless*, 459 U.S. at 6).

[29]*Baldwin v. Reese*, ___ U.S. at ___, 124 S.Ct. at 1351.

[30]*See Anderson v. Harless,* 459 U.S. at 6-7, (1982); *see also Vela v. Estelle,* 708 F.2d 954, 958 (5th Cir. 1983).

[31]*Vasquez v. Hillery*, 474 U.S. 254 (1986); *see Anderson v. Johnson*, 338 F.3d 382, 388 n.24 (5th Cir. 2003) (petitioner is not required to return to state court when supplemental evidence in federal habeas petition does not fundamentally alter the legal claim already considered by the state courts); *but see Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003) (habeas petitioner failed to exhaust state remedies when he presented material additional evidentiary support to the federal court that was not presented to the state court); *Hart v. Estelle*, 634 F.2d 987, 989 (5th Cir. 1981) (claim not exhausted when medical records and testimony presented in federal habeas petition were not presented to state court); *Knoxson v. Estelle*, 574 F.2d 1339, 1340 (5th Cir. 1978) (petitioner had not exhausted his claims in state court when evidence presented in supplemental federal habeas brief had not first been presented in state court).

[32]*Anderson v. Johnson*, 338 F.3d at 388 n.24.

[33]*Id.* at 389 n.26.

evidence he adds in his federal petition falls short of a 180 degree turn.[34]

Because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," it is satisfied "if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law."[35] However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.[36] "The existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."[37] "Objective factors that constitute cause include interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel."[38]

With the foregoing principles in mind, the Court will consider whether Ford has exhausted his claims, and if not, whether he has adequately shown cause and prejudice for his default.

---

[34]*See id.*

[35]*Gray v. Netherland*, 518 U.S. 152, 161-62 (5th Cir. 1996) (citing *Castille*, 489 U.S. at 351 and *Engle* v. *Isaac*, 456 U.S. 107, 126, n.28 (1982)).

[36]*See Gray*, 518 U.S. at 162; *Teague* v. *Lane*, 489 U.S. 288, 298 (1989); *Isaac*, 456 U.S. at 126, n.28, 129; *Wainwright* v. *Sykes*, 433 U.S. 72, 90-91 (1977).

[37]*Murray v. Carrier*, 477 U.S. 478, 488 (1986).

[38]*McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (internal quotation marks and citation omitted).

## C. Discussion

### 1. Ineffective assistance of counsel

To the extent Ford contends that he did exhaust his ineffective assistance claim in state court because, taken together, his pre-state habeas application request and his renewed and amplified request in the actual state habeas application presented all the information presented to this Court in his request for funds, this argument is unpersuasive.  The issue is whether Malpass' *report*, produced as a result of this Court granting Ford's request for funds, fundamentally alters or merely supplements the ineffective assistance of counsel claim raised in state court.  If the report fundamentally alters the claim, then Ford has failed to fairly present his claim in state court and thus has not exhausted it.  If the report merely supplements the claim presented to the state courts, then Ford will have satisfied the exhaustion requirement.

Although it is admittedly a close case, the Court concludes that Ford has exhausted his state court remedies regarding this claim, because Malpass' report supplements rather than fundamentally alters the claim presented to state court.  While the Court agrees with Respondent that Malpass' instant report and accompanying exhibits are more extensive than the material from Malpass that Ford submitted on state habeas review and concludes that it strengthens Ford's claim, it nevertheless concludes that the evidence does not rise to the level of a "180-degree turn."[39]  Rather, the reports, exhibits, and Malpass' studies "merely confirm[] what [Ford] has been claiming all along" (*i.e.*, that an eyewitness identification expert was critical to his defense of mistaken identity and that trial counsel was ineffective for failing to secure Malpass' services).[40]  The Court moreover notes that Ford has not attempted to defeat the purpose of the

---

[39]*See Anderson v. Johnson*, 338 F.3d at 389 n.26.

[40]*See id.* at 388.

11

exhaustion doctrine by deliberately withholding essential facts from the state courts until he

reached a more receptive forum.[41]  To the contrary, he has vigorously argued his claim

throughout the state court proceedings.  Accordingly, the Court concludes that Ford has

exhausted his ineffective assistance claim and that it may evaluate it on the merits.[42]

### 2. Brady claim

Ford concedes, and the Court agrees, that he failed to exhaust his *Brady* claim in state

court and that it would now be procedurally barred from state review.[43]  Therefore, the only

question before the Court is whether Ford has sufficiently demonstrated cause and prejudice for

his procedural default.  After reviewing the entire record below and the parties' arguments, the

Court concludes that Ford has demonstrated neither cause nor prejudice and therefore has not

overcome the procedural bar to federal review of his *Brady* claim.

The prosecution's suppression of evidence favorable to the accused upon request violates

due process when the evidence is material either to guilt or innocence, or to punishment,

regardless of the prosecution's good or bad faith.[44]  The three essential elements of a *Brady*

prosecutorial misconduct claim are:  (1) the evidence at issue must be favorable to the accused,

---

[41]*See id.* at 389 (petitioner exhausted federal claim in state court when he merely supplemented facts presented to state courts and had diligently pursued claim in state court proceedings).

[42]The Court concludes, however, that if it had reached the opposite conclusion, determining that Ford had failed to exhaust his claim, Ford would not have been able to demonstrate cause and prejudice sufficient to overcome the procedural bar to federal review.  Ford's "cause" argument is essentially that, at the state level, he was deprived of the funding necessary to develop and present his claim.  The Fifth Circuit has clearly rejected Ford's argument.  *See Roberts v. Dretke*, 356 F.3d 632, 639-40 (5th Cir. 2004) (rejecting argument that state court's denial of funds constituted cause for failing to develop and present claim in state court before raising it in federal habeas petition).

[43]*See* Pet'r Reply to Resp't Orig. Answer at 37-38.

[44]*Banks v. Dretke*, ___ U.S. ___ 124 S.Ct. 1256, 1272 (2004); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

either because it is exculpatory or impeaching; (2) that evidence must have been suppressed by

the State, either willfully or inadvertently; and (3) prejudice must have ensued.[45]

> "Cause and prejudice" [regarding a *Brady* claim] "parallel two of the three
> components of the alleged *Brady* violation itself." Corresponding to the second
> *Brady* component (evidence suppressed by the State), a petitioner shows "cause"
> when the reason for his failure to develop facts in state-court proceedings was the
> State's suppression of relevant evidence; coincident with the third *Brady*
> component (prejudice), prejudice within the compass of the "cause and prejudice"
> requirement exists when the suppressed evidence is "material" for *Brady*
> purposes.[46]

"The materiality inquiry is not just a matter of determining whether, after discounting the

inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to

support the jury's conclusions. Rather, the question is whether the favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine confidence in

the verdict."[47]

To support his argument for cause (*i.e.*, that the State suppressed relevant evidence), Ford

relates the following events. In 2002, Ford's investigator, William O. Juvrud ("Juvrud")

interviewed Robert Thomas ("Thomas"), a court reporter assigned to Ford's case. Ford asserts

that this interview yielded "new evidence" supporting his claim that Victor Belton, rather than

Ford, entered the Murillo's house with Van Belton.[48] In his affidavit, Juvrud states that Thomas

related a conversation that he had with several El Paso police officers soon after Ford's trial.[49]

---

[45]*See Banks*, ___ U.S. at ___, 124 S.Ct. at 1272.

[46]*Id.*

[47]*Strickler v. Greene*, 527 U.S. 263, 290 (1999); *see Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

[48]*See* Am. Pet. at 31; Pet'r Ex. 15 (Affidavit of William O. Juvrud).

[49]*See* Pet. Ex. 15 at ¶ 3.

According to Juvrud, Thomas said that the officers told him that "the word on the street" was that Victor Belton "did the shooting."[50]  However, Thomas could not remember the officers' names.[51]

This "new evidence" was then confirmed, argues Ford, by two "people on the street," Tammond J. Brookins and Marvin Dodson.[52]  Brookins, in a written declaration, stated that, in December 1992, Victor Belton implied to him that he had been involved in a shooting.[53]  Brookins later concluded that Victor meant the murder of Armando Murillo.[54]  As evidence of further confirmation, counsel has submitted his own affidavit stating that Marvin Dodson told him that, in 1991, Van Belton asked Dodson to implicate Tony Ford in the Murillo murder.[55]

Ford also contends that Lisa Milstein's (another investigator, hereinafter, "Milstein") 2002 conversation with Jose Chrisman revealed that El Paso police officers knew, as Ford has maintained, there were three people involved in the Murillo break-in and murder.[56]  Chrisman was apparently Mrs. Murillo's boyfriend at the time of the murder.[57]  According to Milstein, Chrisman said that, when Mrs. Murillo was recovering from her gunshot wound, she told him that "there were three people involved in the crime.  Two men came inside and one stayed

---

[50]See id.

[51]See id. at ¶ 4.

[52]See Am. Pet. at 32.

[53]See Pet'r Ex. 16 at ¶¶ 4-5 (Declaration of Tammond J. Brookins).

[54]See id.

[55]See Pet'r Ex. 17 at ¶¶ 2-4 (Declaration of Richard Burr Concerning Marvin Dodson).

[56]See Am. Pet. 34.

[57]See id.

outside as a lookout."[58]  Ford asserts that the "fact" that Mrs. Murillo knew that three people were involved or was told this by the police was never revealed to the defense.[59]

Lastly, Ford argues that Van Belton's changing account of the crime should have alerted police officers that Van was attempting to divert suspicion from his brother, Victor.[60]  Upon arrest, Van maintained that only two people, himself and Tony Ford, had broken into the Murillo's house.[61]  Van further stated that Ford had a gun and that he (Van) had left the house before the murders occurred.[62]  Some months before his trial, Van changed his story.[63]  He told his lawyers that a third person, "Tyrone Fields," had been involved in the crime.[64]  Specifically, asserts Ford, Van told his lawyers that Fields had been in the house, too, and remained with Ford after Van left.[65]  Van's lawyers then conveyed this information to Ford's trial counsel.[66]  Ford's trial counsel mentioned Fields in a letter to the prosecutor handling Ford's case.[67]

Ford contends that the prosecution "knew about Van Belton's fabrication concerning

---

[58]*See* Pet'r Ex. 18 at ¶ 4 (Declaration of Lisa Milstein).

[59]*See* Am. Pet. at 34.

[60]*See id.*

[61]*See* Pet'r Ex. 19 at ¶ 3 (Voluntary Statement of Accused).

[62]*Id.* at ¶¶ 3-4.

[63]*See* Am. Pet. at 35.

[64]*See id.*

[65]*See id.*

[66]*See id.*

[67]*See* Pet'r Ex. 20 at ¶ 2 (Letter from Gregory C. Anderson to Luis Aguilar, dated Jan. 12, 1993).

Tyrone Fields and should have known its significance."[68] He cites counsel's interview with Van

in December 2002, in which Van exhibited scant knowledge of Tyrone Field's background and

was reluctant to inform counsel of Victor's present whereabouts, as further support for the claim

that Van was lying to protect Victor.[69]

After due consideration, the Court concludes that Ford has not demonstrated cause

because he has not shown State suppression.  Further, the Court concludes that even if Ford

could show "cause" within the meaning of *Brady*, he cannot show prejudice because the

"evidence" simply cannot be characterized as material.

Petitioner utterly failed to present the state habeas court with any evidence suggesting that

any basis in reality existed for these rank hearsay and hearsay within hearsay rumors about the

offense.[70]  Further, neither the hearsay statement that Van Belton purportedly made to Dodson

---

[68] *See* Am. Pet. at 35-6.

[69] *See* Am. Pet. at 35; Pet'r Ex. 21 at ¶¶ 7-9 (Declaration of Richard Burr Concerning Van Belton).

[70] *See United States v. Watson*, 76 F.3d 4, 7-8 (2d Cir. 1996) (no *Brady* violation when an inculpatory rumor contained in pre-sentence report was not disclosed to defense; defendant's argument for materiality was sheer speculation and insufficient to meet his burden)*; United States v. Villarreal*, 963 F.2d 725, 730 (5th Cir. 1992) (petitioner's purportedly new evidence was little more than rumor and "d[id] not rise above the level of conjecture, hearsay, or speculation.")*; United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000) (there was no Brady violation when prosecution failed to turn over "evidence" that some inmates believed that certain inmate deaths at issue were caused by something other than hits by the defendant's prison gang; "[t]his evidence, limited as it was to rumors that sweep prisons when any untoward event occurs, was so valueless that its exclusion from trial could not be considered material."); *Smith v. Stewart*, 140 F.3d 1263, 1273 (9th Cir. 1998) (no *Brady* violation occurred when counsel was not informed that police had heard about a rumor in the community that the defendant's brother was in the car with the defendant, but the defendant had entered the store to commit the robbery; court found it "pretty difficult to see how the information was favorable. If it were, it was so weak, so remote, and so inconclusive that it is highly unlikely that it would have had any effect whatever upon the verdict, much less would it 'undermine confidence in the outcome' of the trial."); *compare Monroe v. Blackburn*, 476 U.S. 1145, 1150 (1986) (Marshall, J. dissenting) ("[A]dmissions by a wife-killer incriminating himself in the murder of a former wife cannot be dismissed as idle gossip."); *Cf. Banks*, ___ U.S. at ___, 124 S.Ct. at 1274 (*Brady* violated when key prosecution witness at guilt-innocence and punishment stages twice committed perjury but prosecution allowed testimony to stand uncorrected; witness' status as paid

16

nor the double hearsay statement that Victor Belton purportedly made to Brookins shows that the *State* possessed this information, much less that the State suppressed it.  Similarly, the investigator's affidavit regarding Jose Chrisman's purported statements about Mrs. Murillo's purported statement does not show that Mrs. Murillo ever conveyed such information to the State, that the State conveyed the information to her, or  that the State had independent knowledge of a rumor placing a third person at the scene of the crime.

Moreover, assuming that Van Belton altered his rendition of events before trial, implicating a third party in the crime, Ford has not shown that the prosecution learned about the change in Belton's story until informed of it by Ford's counsel.  Counsel states that Van related the Fields story to his own lawyers; Van's attorneys, in turn, related the change in Van's account to Ford's lawyers; then Ford's lawyers disclosed the information to the prosecution.  Further, it is difficult to argue that information was exculpatory or material.  Belton's story about Field does not exculpate Ford; Van's altered account still placed Ford in the house with the gun.[71] Additionally, the fact that Ford's defense counsel had the information and yet did not attempt to use it at trial belies the claim that the information exculpated Ford and was material to his defense.

For the reasons discussed above, the Court concludes that Ford has failed to show cause or prejudice for failing to develop facts in state proceedings.  Because, as Ford concedes, his *Brady* claim would now be procedurally defaulted under Texas law and he has failed to show

---

informant was never revealed to defense, despite prosecution's representation that it maintained an open file policy and would fully disclose any exculpatory evidence to defense).

[71]If anything, the change minimally exculpates Van Belton himself, maintaining his original assertion of limited involvement and yet remaining consistent with the Murillos' statements that there were two assailants in the house when Armando Murillo was murdered.

cause and prejudice for the default, the Court concludes that it may not review Ford's instant

Brady claim. **Ford is therefore not entitled to federal habeas review of his sixth claim of**

**error.**

3.      *Tainted jury at punishment phase*

Ford concedes that he did not raise the claim regarding Juror Aguilar in state court.[72]  He

makes no argument that his claim would not now be procedurally barred, nor does he attempt to

show cause and prejudice for his failure to raise the claim in state court.

After reviewing the claim, the Court concludes that Respondent is correct that the claim

would now be procedurally barred in state court.  It further concludes that Ford has not shown

cause or prejudice to overcome the procedural default.  Accordingly, **Ford is not entitled to**

**federal habeas review of his eleventh claim of error.**

Having determined that Ford exhausted his first ineffective assistance of counsel claim

but failed to exhaust his *Brady* claim or claim of juror taint in state court, the Court now turns to

the merits of Ford's remaining claims.

III.    APPLICABILITY OF THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF
        1996

A.      *The AEDPA Standard of Review*

Because Ford filed his federal habeas corpus action after the effective date of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), insofar as the state courts

adjudicated his claims herein on the merits, the AEDPA governs this Court's review of those

claims.[73]

Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas

---

[72]*See* Am. Pet. at 48.

[73] *See Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918 (2001).

corpus relief in this cause concerning any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[74]

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings.[75]  Under the "contrary to" clause, a federal habeas court may grant relief if:  (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.[76] Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but

---

[74] *See Wiggins v. Smith*, ___ U.S. ___, ___, 123 S.Ct. 2527, 2534 (2003); *Price v. Vincent*, ___ U.S. ___, ___, 123 S.Ct. 1848, 1852-53, (2003); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519 (2000); and 28 U.S.C. §2254(d).

[75] *See Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850 (2002); *Penry v. Johnson*, 532 U.S. at 792, 121 S.Ct. at 1918; and *Williams v. Taylor*, 529 U.S. at 404-05, 120 S.Ct. at 1519.

[76] *See Price v. Vincent*, ___ U.S. at ___, 123 S.Ct. at 1853, ("a decision by a state court is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"); *Bell v. Cone*, 535 U.S. at 694, 122 S.Ct. at 1850; *Penry v. Johnson*, 532 U.S. at 1918, ("A state court decision will be 'contrary to' our clearly established precedent if the state court either 'applies a rule that contradicts the governing law set forth in our cases,' or 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"); and *Williams v. Taylor*, 529 U.S. at 404-06, 120 S.Ct. at 1518-19.

unreasonably applies that principle to the facts of the petitioner's case.[77]  A federal court making

the "unreasonable application" inquiry should ask whether the state court's application of clearly

established federal law was "objectively unreasonable."[78]  The focus of this inquiry is whether

the state court's application of clearly established federal law is objectively unreasonable, rather

than merely incorrect.[79]

The AEDPA significantly restricts the scope of federal habeas review of state court fact

findings, requiring that a petitioner challenging state court factual findings establish by clear and

convincing evidence that the state court's findings were erroneous.[80]

---

[77] *See Wiggins v. Smith,* ___ U.S. at ___, 123 S.Ct. at 2534-35; *Woodford v. Visciotti,* 537 U.S. 19, 24-25, 123 S.Ct. 357, 360 (2002); *Bell v. Cone,* 535 U.S. at 694, 122 S.Ct. at 1850; *Penry v. Johnson,* 532 U.S. at 792, 121 S.Ct. at 1918; and *Williams v. Taylor,* 529 U.S. at 407-08, 120 S.Ct. at 1520-21.
    In *Williams,* the Supreme Court expressly reserved for another day the issue of how federal habeas courts should determine whether a state court erroneously extended a legal principle into a new realm or erroneously refused to extend existing legal principle into a new area. *See Williams v. Taylor,* 529 U.S. at 408-09, 120 S.Ct. at 1521.

[78] *See Wiggins v. Smith,* ___ U.S. at ___, 123 S.Ct. at 2535; *Woodford v. Visciotti,* 537 U.S. at 25, 123 S.Ct. at 360; *Penry v. Johnson,* 532 U.S. at 793, 121 S.Ct. at 1918; *Williams v. Taylor,* 529 U.S. at 409-11, 120 S.Ct. at 1520-22.

[79] *See Wiggins v. Smith,* ___ U.S. at ___, 123 S.Ct. at 2535; *Price v. Vincent,* ___ U.S. at ___, 123 S.Ct. at 1853, ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner."); *Woodford v. Visciotti,* 537 U.S. at 25, 123 S.Ct. at 360; *Bell v. Cone,* 535 U.S. at 694, 122 S.Ct. at 1850; *Penry v. Johnson,* 532 U.S. at 793, 121 S.Ct. at 1918; and *Williams v. Taylor,* 529 U.S. at 410-11, 120 S.Ct. at 1522.

[80] *See Foster v. Johnson,* 293 F.3d 766, 776 (5th Cir. 2002), *cert. denied,* 537 U.S. 1054 (2002); *Rudd v. Johnson,* 256 F.3d 317, 319 (5th Cir. 2001), *cert. denied,* 534 U.S. 1001 (2001) ("The presumption is particularly strong when the state habeas court and the trial court are one and the same."); *Dowthitt v. Johnson,* 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied,* 532 U.S. 915 (2001); *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied,* 531 U.S. 849 (2000), (holding state court fact findings are presumed correct and the petitioner has the burden of rebutting the presumption by clear and convincing evidence); *Hicks v. Johnson,* 186 F.3d 634, 637 (5th Cir. 1999), *cert. denied,* 528 U.S. 1132 (2000), (holding the AEDPA requires federal habeas courts to accept as correct state court factual determinations unless the petitioner rebuts same by clear and convincing evidence); *Morris v. Cain,* 186 F.3d 581, 583 (5th Cir. 1999); *Davis v. Johnson,* 158 F.3d 806, 812 (5th Cir. 1998), *cert. denied,* 526 U.S. 1074 (1999); *Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir. 1998), *cert. denied,* 526 U.S. 1041 (1999); *Williams v. Cain,* 125 F.3d 269, 277 (5th Cir. 1997), *cert. denied,* 525 U.S. 859 (1998), (recognizing that under the AEDPA, state court factual findings "shall be presumed correct unless

With the foregoing principles in mind, this Court turns to the merits of Ford's claims for

federal habeas corpus relief.

## IV.   THE MERITS OF FORD'S REMAINING CLAIMS

### A.   *Claim One:  Trial Counsel Provided Ineffective Assistance in Pursuing the Defense Motion for Appointment of a Defense Eyewitness Identification Expert.*

> 1.     *Legal Standard – Constitutionally Ineffective Assistance of Counsel*

The Supreme Court established the legal principles that govern ineffective assistance of

counsel claims in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Wiggins v. Smith*, 123 S. Ct.

2527, 2535 (2003), the Supreme Court reiterated that:

> An ineffective assistance of counsel claim has two components: A petitioner must
> show that counsel's performance was deficient, and that the deficiency prejudiced
> the defense.  To establish deficient performance, a petitioner must demonstrate
> that counsel's representation "fell below an objective standard of reasonableness."
> We have declined to articulate specific guidelines for appropriate attorney conduct
> and instead have emphasized that "the proper measure of attorney performance
> remains simply reasonableness under prevailing professional norms."[81]

To establish that counsel's representation fell below an objective standard of

reasonableness, a convicted defendant must overcome a strong presumption that his trial

counsel's conduct fell within a wide range of reasonable professional assistance.[82]  Reviewing

courts are extremely deferential in scrutinizing counsel's performance, making every effort to

---

rebutted by 'clear and convincing evidence'"); *Hernandez v. Johnson*, 108 F.3d 554, 558 & n.4 (5th Cir. 1997), *cert. denied*, 522 U.S. 984 (1997), (holding that under the AEDPA, the proper forum for the making of all factual determinations in habeas cases will shift to the state courts "where it belongs" and recognizing that the AEDPA clearly places the burden on the federal habeas petitioner "to raise and litigate as fully as possible his potential federal claims in state court"); and 28 U.S.C. § 2254(e)(1).

[81] *Wiggins*, 123 S.Ct. at 2535 (internal citations omitted).

[82] *See Darden v. Wainwright*, 477 U.S. 168, 184 (1986);  *Strickland*, 466 U.S. at 687-91;  *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997); *Belyeu v. Scott*, 67 F.3d 535, 538 (5th Cir. 1995).

eliminate the distorting effects of hindsight.[83]  It is strongly presumed that counsel rendered

adequate assistance and exercised reasonable professional judgment in making all significant

decisions.[84]  An attorney's strategic choices, usually based on information supplied by the

defendant and from a thorough investigation of relevant facts and law, are virtually

unchallengeable.[85]  Counsel is required neither to advance every non-frivolous argument, nor to

investigate every conceivable matter, nor to assert patently frivolous arguments.[86]  A criminal

defense counsel is not required to exercise clairvoyance during the course of a criminal trial.[87]

However, even if counsel's performance falls below an objective standard of

reasonableness, "[a]n error by counsel, even if professionally unreasonable, does not warrant

---

[83]*See, e.g., Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993);  *Burger v. Kemp*, 483 U.S. 776, 789 (1987); *Strickland*, 466 U.S. at 689;  *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).

[84]*See Strickland*, 466 U.S. at 690;  *Duff-Smith*, 973 F.2d at 1182; *Drew*, 964 F.2d at 422.

[85]*See Boyle v. Johnson*, 93 F.3d 180, 187-88 (5th Cir. 1996) (holding that an attorney's decision not to pursue a mental health defense or to present mitigating evidence concerning the defendant's possible mental illness was reasonable where counsel was concerned that such testimony would not be viewed as mitigating by the jury and that the prosecution might respond to such testimony by putting on its own psychiatric testimony regarding the defendant's violent tendencies); *West v. Johnson*, 92 F.3d 1385, 1406-09 (5th Cir. 1996) (holding that a trial counsel's failure to conduct further investigation into the defendant's head injury and psychological problems was reasonable where interviews with the defendant and the defendant's family failed to produce any helpful information); *compare Wiggins*, ___ U.S. at ___, 123 S. Ct. at 2536 (in capital case, counsel's decision not to expand its mitigation-defense investigation beyond PSI and DSS records, despite suggestions that additional, significant mitigating evidence existed, was itself unreasonable and fell below professional standards).

[86]*See Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point."); *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995) (stating that "[c]ounsel is not required by the Sixth Amendment to file meritless motions."); *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992) (stating that "[t]he defense of a criminal case is not an undertaking in which everything not prohibited is required.  Nor does it contemplate the employment of wholly unlimited time and resources").

[87]*See Sharp v. Johnson*, 107 F.3d 282, 290 n.28 (5th Cir. 1997) (citing *Garland v. Maggio*, 717 F.2d 199, 207 (5th Cir. 1983) (holding that clairvoyance is not a required attribute of effective representation).

setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[88]

Accordingly, "any deficiencies in counsel's performance must be prejudicial to the defense in

order to constitute ineffective assistance under the Constitution."[89]  To establish that he has

sustained prejudice, the convicted defendant "must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a probability sufficient to undermine confidence in the

outcome."[90]  The Court must consider not merely whether the outcome of the defendant's case

would have been different, but also whether counsel's deficient performance *caused* the outcome

to be unreliable or the proceeding to be fundamentally unfair.[91]

Because a convicted defendant must satisfy both prongs of the *Strickland* test, his failure

to establish either deficient performance or prejudice under that test makes it unnecessary to

examine the other prong.[92]  Therefore, a convicted defendant's  failure to establish that his

counsel's performance fell below an objective standard of reasonableness avoids the need to

consider the issue of prejudice.[93]  Similarly, it is also unnecessary to consider whether counsel's

---

[88]*Strickland*, 466 U.S. at 691.

[89]*Id.* at 692.

[90]*Strickland,* 466 U.S. at 694;  *see also Loyd*, 977 F.2d at 159; *Cantu v. Collins*, 967 F.2d 1006, 1016 (5th Cir. 1992).

[91]*Lockhart v. Fretwell*, 506 U.S. 364, 368-73 (1993)(emphasis added)   ("[u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him"); *Lackey v. Johnson*, 116 F.3d at 152.

[92]*Strickland*, 466 U.S. at 700;  *Green*, 116 F.3d at 1122; *see also Burnett v. Collins*, 982 F.2d at 928 (holding that the defendant bears the burden of proof on both prongs of the *Strickland* test).

[93]*Hoskins*, 910 F.2d at 311; *Thomas*, 812 F.2d at 229-30.

performance was deficient where there is an insufficient showing of prejudice.[94]  Moreover, mere conclusory allegations in support of claims of ineffective assistance of counsel are insufficient, as a matter of law, to raise a constitutional issue.[95]

2.    *The Parties' Contentions*

Ford contends that identity was a strongly disputed issue at trial.[96]  He argues that the prosecution's case rested entirely on Murillo sisters' identification of him as one of the two men who broke into their mother's house and, more significantly, as the individual who gave the orders and actually shot their brother Armando.[97]  Ford's defense throughout the trial on guilt-innocence (and persisting into the punishment phase) was that he was never inside the Murillos' house and that it was Victor Belton who broke into the house with his brother, Van Belton.[98]  Ford insisted that the Murillo sisters mistakenly identified him, because it was Victor Belton who was inside the house with Van, and Victor who shot Armando Murillo.[99]  Ford testified that he stayed outside in the vehicle and that the only thing he did wrong was loaning his coat to Victor.[100]  According to Ford, Victor asked for Ford's coat because he wanted use it to conceal a

---

[94]*See Black*, 962 F.2d at 401; *Pierce*, 959 F.2d at 1302.

[95]*See Kinnamon v. Scott*, 40 F.3d 731, 735 (5th Cir. 1994) (holding that a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief).

[96]*See* Am. Pet. at 6.

[97]*See id.*

[98]*See id.*  Van Belton was charged with the crimes that occurred at the Murillo home.  His brother, Victor Belton, was arrested and charged with assaulting the officers who came to the Belton house to arrest his brother.

[99]*See* Am. Pet. at 6.

[100]*See id.*

24

gun.[101]

Ford argues that "[h]elping the jury understand that the Murillo's [*sic*] identifications of [him] were mistaken was the key to defending [him]" and that his "[trial] counsel knew that an eyewitness expert was critical to helping the jury understand the unreliability of the Murillo's [*sic*] identifications."[102]  Accordingly, in a pre-trial motion, trial counsel attempted to persuade the trial judge to appoint an eyewitness identification expert by showing of the defense's need for this expert.[103]  The prosecution opposed the motion, arguing that counsel had not made an adequate showing that the expert's ultimate testimony would be admissible under Texas law.[104] Counsel responded that he might need to develop more of a record to show the court how important an eyewitness identification expert would be to Ford's defense.[105]  Counsel also conceded that he did not then know of any law requiring the trial judge to appoint such an expert. Counsel re-urged his motion for an eyewitness identification expert at a later pre-trial hearing. The trial judge gave counsel two weeks in which to provide supporting authority and reargue the motion or it would be overruled.[106]  Counsel did not provide additional authority, and the court accordingly entered a written order denying the motion.

It is in failing to provide the legal authority, Ford argues, which existed and could easily

---

[101]*See* Am. Pet. at 5-6, 10.

[102]*See id.* at 6.

[103]*See* Am. Pet. at 6; *see also* St. of Facts, Vol. IV at 20.

[104]*See* St. of Facts, Vol. IV at 20.

[105]*See id.*

[106]*See id.* at 21.

have countered the prosecution's opposition, that his trial counsel was ineffective.[107]  Ford

acknowledges that it was a strategic decision for counsel to decide *whether* to seek the

appointment of an eyewitness identification expert, and that counsel would not have been

ineffective if he had decided not to seek appointment of an expert.[108]  But once counsel made the

decision to seek the appointment and took active steps to obtain the appointment by filing his

motion with the court, Ford argues, counsel was ineffective for failing to properly research the

applicable law to support his motion and present his findings to the trial court.[109]  Ford asserts

that he was prejudiced as a result, by not having an expert explain to the jury that eyewitness

identifications are often unreliable.  By implication, Ford argues that the expert's testimony

would have cast sufficient doubt in the jurors' minds about the reliability of the Murillo sisters'

identification that it would have changed the trial's outcome.

Respondent argues that Ford's claims should be rejected on the merits because he fails to

meet either prong of the *Strickland* test for ineffective assistance of counsel.[110]  First, Respondent

asserts that the Fifth Circuit rejected as "specious" exactly Ford's argument in *Cantu v. Collins*,

967 F.2d 1006, 1016 (5th Cir. 1992).[111]  In *Cantu*, a Texas death row inmate alleged that his trial

counsel was ineffective for failing to secure the services of an expert witness to contest the

testimony of an eyewitness.[112]  The Fifth Circuit rejected Cantu's argument as "specious," stating

---

[107]*See* Am. Pet. at 6.

[108]*See id.* at 17.

[109]*See id.*

[110]*See* Resp't Orig. Answer at 14-15.

[111]*See id.*

[112]*See id.*

that:

> While petitioner is correct that the admission of expert testimony regarding
> eyewitness identifications is proper, he cites no authority to support the theory that
> his trial counsel was *required* to call an expert witness to challenge [the
> eyewitness'] testimony.  Indeed, Cantu's trial counsel testified at the evidentiary
> hearing that he considered seeking the services of an expert witness on the issue
> of eye-witness identification but decided against it based on his belief that his
> cross-examination of [the eyewitness] would be sufficient to refute the accuracy
> of the identification.[113]

Respondent argues that since Ford's counsel clearly considered and sought the appointment of an

expert, counsel went a step further than the representation provided by Cantu's trial counsel that

the  Fifth Circuit found constitutionally adequate.[114]  Therefore, if counsel's performance in

*Cantu* was not deficient, then counsel's performance in Ford's case cannot be deficient.[115]

Respondent further argues that, even assuming that counsel's performance was deficient,

Ford cannot prevail on his ineffective assistance of counsel claim because he cannot show that he

was prejudiced by the purported error.[116]  Respondent notes that even if counsel had made the

most persuasive argument and made the greatest effort possible to ensure that the eyewitness

expert was appointed, it was still, as a matter of Texas law (and contrary to Ford's assertion),

entirely within the trial judge's discretion whether to admit the expert's testimony.[117]  There is

simply no guarantee, argues Respondent, that the trial judge would have admitted Malpass'

---

[113]*Cantu*, 967 F.2d at 1016.

[114]*See* Resp't Orig. Answer at 15.

[115]*See id.*

[116]*See id.* at 15-16.

[117]*See id.*

testimony.[118]

Furthermore, even if the trial judge had admitted the testimony, Respondent argues that it is "inconceivable" that the jury would have rendered a different verdict.[119]  Respondent observes that, in *United States v. Jackson*, 50 F.3d 1335 (5th Cir. 1995), the Fifth Circuit rejected the defendant's claim that his counsel's failure to obtain an identification witness' services – in fact, the very same expert, Rex Malpass, whose services were at issue in Ford's trial – prejudiced him.[120]  The Fifth Circuit found that because Jackson, like Ford, was placed at the scene of the crime by evidence other than eyewitness testimony, "it is most improbable, to say the least, that Dr. Malpass' generalized testimony about the supposed unreliability of expert witness identifications would have established reasonable doubt as to the identity of the robber."[121]

Respondent argues that the same circumstances exist in Ford's case.[122]  The eyewitness identifications by the Murillo sisters were not the only evidence implicating Ford in the murder. By his own testimony, Ford placed himself at the murder scene, albeit, outside the house as the murder was occurring.  Fibers consistent with the sweater that Armando Murillo was wearing,  as was a small amount of blood, were found on the coat Ford was wearing when he was arrested.  It was for the jury to determine whether Ford was wearing the coat when the fiber evidence and blood came to be there – in other words, whether Ford was inside the house, wearing the coat, while he shot Armando Murillo in the back of the head.  Moreover, it is as unlikely in Ford's

---

[118]*See id.* at 16.

[119]*See id.*

[120]*See id.* at 16-17.

[121]*Jackson*, 50 F.3d at 1340 (citing *United States v. Laury*, 49 F.3d 145, 150-51 (5th Cir. 1995).

[122]*See* Resp't Orig. Answer at 17.

case as it was in *Jackson*, Respondent argues, that Malpass' generalized testimony about the reliability of eyewitness identifications would have been particularly helpful to the jury in assessing the credibility of the sisters against that of Ford himself.[123]

3.   *Discussion*

The Court notes the following facts.  In his prayer for relief, state habeas counsel made a generalized request to conduct discovery (including authorization to take depositions and subpoena witnesses) and for the trial court to hold an evidentiary hearing.[124]  The state habeas court, which was the same court that presided over Ford's trial, declined to hold an evidentiary hearing because it concluded that all previously unresolved factual issues material to Ford's confinement could be and had been determined from the parties' pleadings, exhibits, and the record on direct appeal.[125]

Although the state habeas court did not hold an evidentiary hearing, the State was nonetheless able to obtain trial counsel's affidavit and present it to the state habeas court with its Answer.  In the affidavit, trial counsel addressed his reasons for certain actions and omissions at trial, specifically:  (1) Ford's decision to testify; (2) why counsel did not question the jury panel on party liability; (3) why counsel did not question the jury panel on racial bias; and (4) why counsel did not call a psychiatric expert to testify about Ford's future dangerousness.[126]  Ford, on the other hand, did not come forward with an affidavit from trial counsel stating why he did not

---

[123]*See id.* at 17-18.

[124]*See Ex parte Ford*, Am. Orig. App. for [State] Writ of Habeas Corpus at 101.

[125]*See Ex parte Ford*, Findings of Fact & Conclusions of Law at 379.

[126]*See Ex parte Ford*, Affidavit of Norbert J. Garney at 348 ¶¶ 4-6.

pursue his motion to have an eyewitness identification expert appointed, in an attempt to show that some factual basis existed to support his ineffective assistance claim.  Nor did he attempt to show that trial counsel refused to cooperate with state habeas counsel.

The state habeas court found that defense counsel timely filed and presented a motion for an eyewitness identification expert, but did not provide evidence or affidavits to support it.[127]  It did not directly address the question of deficient performance, focusing instead on the prejudice prong of the *Strickland* test.  It concluded that Ford could not show prejudice, given:  (1) Ford's admission of party liability at trial and in his state writ; (2) the fact that the fibers from Ford's coat (which he was wearing when he was arrested the day after the offense) matched fibers found on Armando Murillo's body; (3) its finding that Myra Murillo's identification of Ford in the photo line up was not the product of police misconduct; and (4) its finding that Myra Murillo did not misidentify Ford or identify anyone other than Ford.[128]

Because the state habeas court did not make a specific finding of deficient performance, the Court will consider the question *de novo*, keeping in mind that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and evaluate the conduct from counsel's perspective at the time."[129]  In all circumstances, the defendant must overcome the strong presumption that under the

---

[127]*See Ex parte Ford*,  Findings of Fact & Conclusions of Law at 380 ¶ 1.

[128]*See id.* at 382-83.

[129]*Bell v. Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland v. Washington*, 466 U.S. at 689).

circumstances, the challenged action might be considered sound trial strategy.[130]

After considering the matter, the Court concludes that Ford has not carried his burden. First, Ford has not demonstrated that, as of the date of his trial, there was a United States Supreme Court or Texas Court of Criminal Appeals opinion clearly establishing a right to have an eyewitness identification expert appointed on demand.  Absent some legal authority establishing that he had a right to have such an expert appointed, the burden was on Ford to show that his trial counsel acted in an objectively unreasonable manner in not pursuing the motion for an appointment of an eyewitness expert.  Although counsel's failure to pursue the motion for appointment of an eyewitness expert gives the Court momentary pause, it is only momentary. Counsel's failure to pursue the motion is not so clearly objectively unreasonable that it defeats the strong presumption of adequate assistance, particularly when Ford has simply presented no evidence to overcome the such presumption.

Although the Court concludes that Ford has not met the first prong of the *Strickland* test, in an abundance of caution it will review the state habeas court's conclusion that Ford failed to show prejudice.  It concludes that Ford has likewise failed to show prejudice from attorney error, if any.

By Ford's own account, counsel persistently attempted to cast the reliability of the identifications in doubt.[131]  Counsel introduced a booking photo taken of Victor Belton immediately after the murder and introduced Victor's booking sheets, which included Victor's

---

[130]*See id.*

[131]*See* Am. Pet. at 11-14.

height and weight.[132]  Comparing Victor's physical characteristics with Ford's, counsel noted that

Victor and Ford were the same height and very close in weight and age.[133]  In counsel's closing

argument at the guilt-innocence phase, he emphasized that the stress of the crime would have

made it difficult for the Murillo sisters to remember precisely what the intruders looked like.[134]

He emphasized to the jury that the stress associated with the crime and the similarity of

appearance and stature between Victor and Ford made a mistaken identification much more

likely.[135]  He compared photos of the two men, pointing out the similarity in the shape of the

head and ears, their skin color, haircuts, age, height, and weight.[136]  In sum, counsel repeatedly

emphasized the factors that Malpass' testimony would have conveyed to the jury:  (1) stressful

circumstances can reduce the accuracy of an eyewitness identification; (2) Tony Ford and Victor

Belton had similar physical characteristics; and (3) given the stressful circumstances of the crime

and the physical similarities between Ford and Victor, it was possible that the Murillo sisters

misidentified Ford as the man who shot their brother.  The Court concludes that Malpass'

proposed testimony would not have added significantly to the points that the jury heard from

counsel himself.

Moreover, although the Murillos' identification of Ford was undoubtedly an important

part of the State's case, Ford's repeated admission that he was at the scene of the crime and

---

[132]*See id.* at 11.

[133]*See id.*

[134]*See id.* at 12.

[135]*See id.* at 13.

[136]*See id.*

physical evidence also linked him to the murder. It is unlikely that Malpass' testimony, which in large part would have conveyed the same information that the jury heard from counsel, by itself would have changed the outcome of the trial. Finally, there is no guarantee that the trial judge would have allowed Malpass to testify.[137]

For these reasons, this Court independently concludes that Ford's complaints about this aspect of counsel's performance satisfies neither of *Strickland*'s two prongs. Therefore, the state habeas court's rejection on the merits of this aspect of Ford's multifaceted ineffective assistance claim was neither contrary to, nor an unreasonable application of, clearly established federal law concerning ineffective assistance, nor based on an unreasonable determination of the facts from the evidence before it. **Accordingly, the Court concludes that Ford's first claim of error lacks merit under the AEDPA**.

**B.      *Claim Two: The trial court denied Ford's due process right to the assistance of an eyewitness identification expert*.**

Ford contends that the trial judge violated his right to due process by denying his motion for an identification expert. After careful consideration, the Court concludes that Ford has not shown that he is entitled to relief under 28 U.S.C. § 2254 (d).

*1.      Legal Standard*

A federal court may grant relief based on trial error only when that error resulted in actual prejudice.[138] To show actual prejudice, the petitioner must demonstrate that the purported error,

---

[137]*See* note 6, *supra*, and discussion regarding Ford's second claim of error, *ante*.

[138]*Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice).

if any, had substantial and injurious effect or influence in determining the jury's verdict.[139]

In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held that an indigent

criminal defendant is entitled to the appointment of a psychiatric expert witness if the expert

would be necessary to provide the basic tools to present a defense.  In light of *Ake*, the Fifth

Circuit has held that non-psychiatric experts should be provided only if the evidence is both

critical to the conviction and subject to varying expert opinion.[140]

> [A] defendant cannot expect the state to provide him a most-
> sophisticated defense; rather, he is entitled to "access to the raw
> materials integral to the building of an effective defense." Most of
> those raw materials come to the defendant in the form of his court-
> appointed lawyer– in his expert knowledge about how to negotiate
> the rules of court, how to mount an effective defense, and so forth.
> Other materials come from lay witnesses, such as evidence
> necessary to the defendant to establish his defense.[141]

To be entitled to the appointment of a non-psychiatric expert witness, an indigent defendant must

demonstrate something more than a mere possibility of assistance from the requested expert.[142]

In determining whether a defendant is entitled to have an expert appointed, a court must examine

three factors:  (1) the private interest that will be affected by the action of the state; (2) the

governmental interest that would be affected if the safeguard is to be provided; and (3) the

probable value of additional or substitute safeguards that are sought, and the risk of an erroneous

---

[139]*See Calderon v. Coleman*, 525 U.S. 141, 145 (1998); *Brecht*, 507 U.S. at 637; *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

[140]*See Moore v. Johnson*, 225 F.3d 495, 502 (5th Cir. 2000); *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993); *Scott v. Louisiana*, 934 F.2d 631, 633 (5th Cir. 1991).

[141]*Moore*, 225 F.3d at 503.

[142]*See id.*

deprivation of the affected interest if those safeguards are not provided.[143]

"The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling.. . . The interest of the individual in the outcome of the State's effort to overcome the presumption of innocence is obvious . . .."[144] "The State's interest in prevailing at trial is . . . necessarily tempered by its interest in a fair and accurate adjudication of criminal cases."[145]  The Court's conclusion, therefore, hinges on the last factor.

2.     *Discussion*

In determining whether the trial court erred in denying Ford's motion for appointment of an eyewitness identification expert, this Court's task is to quantify the probable value of Malpass' expert testimony regarding the reliability of eyewitness identifications and the risk that the jury reached an erroneous conclusion because it did not have the benefit of Malpass' expertise.

The state habeas court made a factual determination that there was no misidentification or identification of anyone other than Ford.  Although Ford has speculated that the Murillo sisters mistook Victor Belton for Ford, after reviewing the entire record and the parties' briefs, the Court concludes that he has not rebutted the presumptive correctness of the state court's factual finding

---

[143]*Ake*, 470 U.S. at 77.

[144]*Id.*

[145]*Id.*

by the required standard of clear and convincing evidence,[146] for the reasons discussed below.

Ford's efforts to refute the trial court's factual determination focus on two studies conducted by Malpass.[147] The first is Malpass' evaluation of the line up Ford participated in. Lisa and Myra Murillo each independently chose Ford from this lineup. After discussing his methodology, Malpass concludes that "[i]t is likely that some systematic process is occurring to direct choices to Mr. Ford. The photo spread is biased towards Mr. Ford, and this preference for Mr. Ford's photograph violates the principle that the suspect should not stand out from the other persons (fillers) in a lineup."[148] The second study is a comparison of similarities between the photographs of Ford and Victor Belton. In this regard, Malpass concludes that "of all the face photo pairs in this study, the Ford and Belton pair is rated as the most similar and significantly more similar than the next most similar pair. [Victor] Belton is more similar to Ford than any of the fillers used in the Ford lineup, in some cases by a considerable margin."[149]

This Court's initial inquiry under 28 U.S.C. § 2254(e)(1) is solely whether Ford has shown by clear and convincing evidence that the trial court's factual determinations – that Ford was not mistakenly identified by the eyewitnesses and that there was no impropriety in the way the line up was conducted – were incorrect. After careful consideration, the Court concludes that Ford has not carried his burden. Even if this Court were prepared to accept Malpass' conclusions at face value, setting aside serious questions about his methodology and the statistical

---

[146]*See* 28 U.S.C. § 2254(e)(1).

[147]*See* Pet'r Ex. 11.

[148]*See* Pet'r Ex. 11 at 3 ¶ 3.

[149]*See id.* at 5 ¶ 3.

36

significance of his data, the Court concludes that they assert nothing more than that: (1) the lineup from which the eyewitnesses chose Ford *may* have been suggestive; and (2) Victor Belton looked more like Ford than any other person in the lineup. These conclusions do not show by clear and convincing evidence that the trial judge's determination of the ultimate question was incorrect. There is simply no persuasive evidence that Lisa and Myra Murillo *actually* identified the wrong man.

Further, if this Court were to review the trial court's finding *de novo*, it would not conclude that the trial judge abused his discretion. Ford has not demonstrated that, at the time of Ford's trial, there was clearly established Supreme Court case law holding that a criminal defendant is entitled to the appointment of an eyewitness identification expert as a matter of course in every case in which there is an eyewitness identification. Moreover, at the pre-trial hearing on Ford's motion to suppress the Murillos' identification of Ford, the trial court had an opportunity to observe the witnesses' demeanor and to gauge their credibility under cross-examination. Factual determinations based on trial court's observation of credibility and demeanor are entitled to special deference.[150] Further, the conditions forming the basis for the identifications were not in dispute. Although it is not clear exactly how long the Murillos' assailants were in the house, it was certainly for a longer period of time than mere moments. The assailants were not wearing masks or otherwise attempting to conceal or distort their physical characteristics. There were no allegations that poor lighting or other conditions made it difficult to view the assailants' faces clearly. It was not unreasonable in light of these circumstances and

---

[150]*See Patton v. Yount*, 467 U.S. 1025, 1038 (1984).

after observing the eyewitnesses' demeanor at the hearing for the trial judge to determine that there was no misidentification of Ford or identification of anyone other than Ford. Accordingly, in the absence of any clear and convincing evidence to the contrary, the Court concludes that it must accept the trial court's factual determination as correct and defer to it.[151]

Because the trial court determined that there was no misidentification of Ford, it was therefore not unreasonable for the trial judge to determine that an expert's services would not be particularly relevant or helpful on the issue of identity. If there was no misidentification, then testimony regarding the reliability of eyewitness identifications would hold little, if any, relevance.

Moreover, as discussed regarding Ford's first claim of error, ultimately Malpass' testimony would have duplicated the points that Ford's counsel ably emphasized to the jury. Because the information that Malpass would have conveyed to the jury was actually communicated by Ford's counsel, the Court concludes that there was no risk that the jury reached the wrong result merely because it did not hear Malpass testify.

Furthermore, as one Texas court has recently observed, the purpose of appointing an expert is to level the playing field between the State and criminal defendant.[152] A defendant's access to expert assistance becomes particularly important when that expert will rebut expert

---

[151]*See Wainwright v. Witt*, 469 U.S. 412, 426-27 (describing the presumption of correctness under 28 U.S.C. § 2254(d) and the degree of deference that a federal habeas court must pay to a state trial judge's factual determinations).

[152]*See Deason v. Texas*, 84 S.W.3d 793, 796 (Tex. App.–Houston 1st Dist. 2002).

testimony presented by the prosecution.[153]  Here, the State did not present expert testimony

regarding the reliability of its eyewitnesses' identifications.  Rather, the record indicates that

State stood prepared to defend the reliability of its witnesses' identifications in the time-honored

way – through direct examination and then rehabilitation if the witnesses' reliability was

undermined during the defense's cross-examination.

Lastly, as Respondent observes, if the Court adopts Ford's premise that trial counsel was

ineffective for failing to present sufficient legal authority for granting the motion, the trial court

could not have erred in denying the motion.  The state habeas court found that trial counsel did

not present evidence or affidavits to support the motion, a point which Ford does not dispute,

much less rebut by clear and convincing evidence.[154]  Without a showing of error, Ford cannot

demonstrate that he was subsequently prejudiced by that error.  The Court concludes that the

state habeas court's rejection of Ford's due process claim was not inconsistent with, nor an

unreasonable application of, clearly established federal law concerning due process, nor based on

an unreasonable determination of the facts from the evidence before it.  **Accordingly, the Court**

**concludes that Ford's second claim of error lacks merit under the AEDPA.**.

C. *Claim Three:  Ford's claim that appellate counsel provided ineffective*
*assistance in failing to raise the Ake claim on direct appeal.*

Ford contends that his appellate counsel was ineffective because he did not raise and brief

a claim that he was denied due process under *Ake v. Oklahoma*, 470 U.S. 68 (1985).  More

specifically, Ford faults appellate counsel for not arguing that the trial court denied him due

process when it denied his motion for appointment of an eyewitness identification expert.

---

[153]*See id.*

[154]*See* 28 U.S.C. § 2254(e)(1).

Because the Court has concluded that the trial judge did not deny Ford due process and that counsel's performance was not constitutionally deficient or prejudicial, it also concludes that appellate counsel was not ineffective. An attorney's failure to raise a meritless argument cannot give rise to an ineffective assistance of counsel claim because such performance is not deficient and the result of the proceeding would not have been different had the issue been raised.[155]  The Court concludes that the state habeas court's rejection of this aspect of Ford's ineffective assistance claim was not inconsistent with, nor an unreasonable application of, clearly established federal law concerning effective representation, nor based on an unreasonable determination of the facts from the evidence before it.  **Accordingly, the Court concludes that Ford's third claim of error lacks merit under the AEDPA.**

**D.**    ***Claim Four: Ford was denied due process by the use of a suggestive identification process, designed to produce an identification of him rather than Victor Belton.***

The state habeas court made a factual determination that the procedure used to identify Ford was not unconstitutionally suggestive. For the reasons discussed regarding Ford's second claim of error, the Court concludes that he has not overcome the presumptive correctness of the state court's factual determination. Under 28 U.S.C. § 2254(e)(1), this Court is bound by that factual determination, absent clear and convincing evidence to the contrary. Because the identification process was not suggestive, the Court concludes that Ford was not denied due process. Accordingly, **the Court concludes that Ford's fourth claim of error lacks merit under the AEDPA.**

---

[155]*See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

**E.**     ***Claim Five:  Trial Counsel Provided Ineffective Assistance in Failing to Cross-Examine the Murillos on Facts that Raised Questions about the Reliability of their Identifications***

Ford contends that trial counsel was ineffective because he did not sufficiently cross-examine Lisa Murillo and Myra Murillo to cast the reliability of their identifications into doubt.[156] Ford states that his photograph appeared in the local newspaper and identified him as a suspect in the case.[157] Lisa Murillo later picked Ford's photograph from a police photo spread.[158] Ford contends that trial counsel was ineffective because he did not bring to light the fact that Lisa Murillo had seen Ford's photograph in the newspaper before she picked him from the photo spread.[159]

Ford further asserts that there was some doubt that Myra Murillo had actually picked his photograph from the photo spread.[160] Ford notes that his photograph was number 5 in the spread.[161] Myra Murillo and Detective Lowe, the officer who conducted the photo spread, both testified that she had chosen Ford's photograph from the photo spread at 4:10 p.m. on December 19, 1991, and that she signed the back of Ford's photograph and also noted the date and time as December 19, 1991 and 4:10 p.m.[162] At 4:12 p.m., Detective Lowe typed a statement for Myra to sign concerning the number of the photo that she identified as the individual that killed her

---

[156]*See* Am. Pet. at 27, 30.

[157]*See id.* at 27.

[158]*See id.*

[159]*See id.* at 27, 30.

[160]*See id.* at 27-29.

[161]*See id.* at 28.

[162]*See id.* at 27.

brother.[163]  The unsigned version of the statement said that she had identified the man in

photograph number 4.[164]  In the statement that Myra actually signed, however, the number "4" is

overwritten and replaced by number "5."[165]  The handwritten change is not initialed or

contemporaneously explained.[166]  Ford argues that the discrepancy between the unsigned and

signed version of the statement raises the question of whether Myra actually picked Ford or

someone else's photograph from the spread.[167]  Given the importance of the eyewitness

identification to the prosecution's case, Ford argues, counsel was ineffective for failing to bring

the discrepancy to light on cross-examination.[168]

Ford also faults counsel for failing to bring to light the fact that Myra Murillo recognized

his co-defendant from having seen him over several years at school and in the neighborhood.[169]

Ford argues that:

> With this kind of familiarity with Van Belton, it is likely that Myra
> Murillo sometime also saw his brother Victor, even though she
> could not recall that.  If Victor were the shooter, rather than Tony
> Ford, Victor may, for this reason, have looked familiar to her.
> When she saw Mr. Ford in the photo lineup, she may have picked
> him out because he looked like Victor and Victor was,

---

[163]*See id.* at 28.

[164]*See id.*

[165]*See id.*

[166]*See id.*

[167]*See id.*

[168]*See id.* at 28-29.

[169]*See id.* at 29.

subconsciously, familiar to her.[170]

Lastly, Ford contends that trial counsel was ineffective because he did not elicit the fact that Myra may have told Lisa that she (Myra) had identified photograph number five as the killer.[171]  Ford argues there was no reason for counsel not to raise these questions, as they could have raised substantial doubt about the reliability of the eyewitness identifications.[172]

The decision whether to cross-examine a witness, and if so, how vigorously to challenge that witness' testimony, requires a quintessential exercise of professional judgment.  At the pretrial suppression hearing, defense counsel did cross-examine the sisters on most if not all these issues and argued these same issues to the trial judge.[173]  However, this wider-ranging cross-examination did not yield particularly helpful testimony for Ford.  Moreover, the sisters' pretrial testimony, which apparently convinced the trial judge that their identifications of Ford were reliable, afforded counsel an opportunity to observe these same witnesses first-hand and evaluate the likely impact of their testimony before the jury.  Under these circumstances, and in the absence of any evidence to the contrary, the Court concludes that Ford has not overcome the strong presumption that counsel's decision at trial to limit the scope of cross-examination was reasonable trial strategy.  Further, in light of counsel's failure to sway the trial judge during the pretrial hearing, there is no reasonable probability that, but for the same cross-examination at trial, the outcome of either phase of Ford's proceeding would have been any different.

---

[170]*Id.*

[171]*See id.* at 30.

[172]*See id.*

[173]St. of Facts, Vol. V at 27-38 [Cross-examination of Myra Murillo], 46-52 [Cross-examination of Lisa Murillo], 54-55 [Argument on Motion by Norbert J. Garney].

Accordingly, the Court concludes that Ford has not met either prong of the *Strickland* test for ineffective assistance of counsel, and **therefore his fifth claim of error lacks merit under the AEDPA.**

> **F.**   ***Claim Seven:  Ford's Claim that Trial Counsel Provided Ineffective Assistance in Joining with the Prosecution in Ignoring the Second Sentencing Special Issue during Voir Dire.***

Ford contends that trial counsel was ineffective because he did not question prospective jurors about the second special issue under Texas' death penalty sentencing scheme.[174]  In the sentencing phase of a capital case, Texas juries must consider two preliminary questions:

> (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

> (2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.[175]

If the jury answers "yes" to these two questions, it must then answer a third question:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[176]

Ford argues that both his counsel and the prosecution "acted as if the first and third special issues

---

[174]*See* Am. Pet. at 38-39.

[175]Art. 37.071, § 2(b).

[176]Art 37.071, § 2(e).

were the only matters that the jury would consider."[177]  He contends that counsel was ineffective because he knew or should have known that the law of parties would become an issue, and yet failed to question prospective jurors about party liability.[178]  Although Ford denied any involvement in the crime, counsel "also knew that he had driven to the Murillos' house with [Van and Victor Belton] and that he waited for them to leave the house."[179]

Respondent contends that counsel's decision not to question prospective jurors on the law of parties was reasonable based on the information that Ford supplied.[180]  Respondent notes that on state habeas review, Ford's lead counsel submitted an affidavit in which he stated:

> [a]lthough Mr. Ford and I had discussed his testimony many times prior to trial, the particular version offered under oath, during his trial testimony was neither discussed nor expected.  The theory of party liability was not discussed with the jury panel during voir dire because it was not anticipated that Mr. Ford's testimony would raise the issue.[181]

Moreover, the trial court made a factual finding, which the Court of Criminal Appeals adopted, that although counsel and Ford discussed his testimony beforehand, Ford's actual testimony at trial, which raised the issue of party liability, was unexpected by counsel.

After careful consideration, the Court concludes that Respondent is correct.  Counsel is not required to pursue matters when his client deliberately fails to disclose information about

---

[177]Am. Pet. 38.

[178]*See id.* at 39.

[179]*Id.*

[180]Resp't Orig. Answer at 29.

[181]*Id.* at 29; *Ex parte Ford* at 348.

them.[182] Therefore, the Court concludes that Ford has not demonstrated that trial counsel's performance fell below an objective standard of reasonableness. **The Court concludes that Ford's seventh claim lacks merit under the AEDPA.**

G.   ***Claim Eight: Trial Counsel Failed to Provide Effective Assistance During Voir Dire by Failing to Question Prospective Jurors about Racial Bias.***

Ford relies on the Supreme Court's opinion in *Turner v. Murray*, 476 U.S. 28, 36-37 (1986), for the proposition that a criminal defendant accused of a capital crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. He argues that, under *Turner*, his trial counsel was ineffective for failing to question prospective jurors about racial prejudice.[183]

Ford's reliance on *Turner* is misplaced. That opinion discusses whether it is constitutional for a trial judge to deny a criminal defendant's request to question prospective jurors regarding racial bias.[184] Although the Supreme Court held that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the victim's race

---

[182]*See Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997) (in general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel); *Randle v. Scott*, 43 F.3d 221, 225 (5th Cir. 1995) (scope of an attorney's duty to investigate may be limited by defendant's failure to cooperate); *Bagwell v. Cockrell*, No. SA-99-1133-OG, 2003 U.S. Dist. LEXIS 16107, *94-5 (W.D. Tex. 2003) (the extent of an attorney's investigation into an area must be viewed in the context of the defendant's cooperation with the attorney's investigation and with heavy measure of deference to counsel's judgment); *see also Unites States v. Cronic*, 466 U.S. 648, 657 n.19 (1984) ("the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade").

[183]Am. Pet 39-40.

[184]*See* 476 U.S. at 36-37.

and questioned on the issue of racial bias,[185] the Court made it clear that the right is not self-executing: "[A] defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry."[186]

More on point is the Fifth Circuit's opinion in *Moore v. Butler*, 819 F.2d 517 (5th Cir. 1987). In *Moore*, the Circuit expressly distinguished the type of argument raised in *Turner* (*i.e.*, whether, by denying a capital defendant's request to question prospective jurors regarding racial bias, the trial judge violated the defendant's constitutional rights), from the ineffectiveness-of-counsel argument Petitioner makes in the instant petition.[187]

The African-American defendant in *Moore* was convicted of the first-degree murder of a white victim.[188]  On appeal from the district court's denial of his petition for a writ of habeas corpus, the defendant relied on the Supreme Court's holding in *Turner* for his claim that his trial counsel was ineffective because he did not question the prospective jurors about racial bias.  The Circuit rejected this argument, holding that:

> [T]he combination of a local history of racial discrimination and
> an interracial crime, without more, does not mean that trial counsel
> is deficient in failing to investigate on voir dire the possible racial
> prejudice of veniremen.[189]

Because the defendant had failed to allege how his counsel's "colorblind" approach to

---

[185] *See id.*

[186] *Id.*

[187] *See* 819 F.2d at 520.

[188] *See* 819 F.2d at 518, 520.

[189] 819 F.2d at 520.

questioning the prospective jurors prejudiced his case, other than by pointing out that he had

been tried by an all-white jury, the Circuit concluded that, even assuming for the sake of

argument that counsel's voir dire performance was constitutionally deficient, the defendant

"ha[d] not come close to showing 'that but for counsel's unprofessional errors, the result of the

proceeding would have been different.'"[190]

More recently, in *Clark v. Collins*, 19 F.3d 959, 965 (5th Cir. 1994) , the Circuit has

reinforced *Moore*'s basic lesson:

> We doubt that counsel's failure [to question every prospective juror
> about racial bias] amounted to constitutionally deficient
> performance, but need not resolve that question in view of
> [petitioner's] failure to allege prejudice in satisfaction of the
> second *Strickland* prong.  While [petitioner] points out that
> questions regarding racial bias led to the dismissal for cause of at
> least one venire member, he does not claim that racial bias tainted
> the petit jury actually impaneled.  This claim fails to allege a
> reasonable probability that, but for his attorney's failure to inquire
> into racial bias of prospective jurors, his trial would have reached a
> different result.[191]

The trial court made a factual finding that race was not an issue at trial.[192]  "Factual

determinations by state courts are presumed correct absent clear and convincing evidence to the

contrary, and a decision adjudicated on the merits in a state court and based on a factual

determination will not be overturned on factual grounds unless objectively unreasonable in light

of the evidence presented in the state-court proceeding."[193]  However, "[e]ven in the context of

---

[190]*Moore*, 819 F.2d at 518, 520.

[191]19 F.3d at 965; *see also United States v. Chavez*, 193 F.3d 375, 379 (5th Cir. 1999) (on
collateral review, the *Brecht v. Abramson*, 507 U.S. 619, 637 (1993), standard applies; under this
standard, habeas petitioners are not entitled to relief based on trial error unless they can establish that it
resulted in actual prejudice).

[192]*See Ex parte Ford* at 381 ¶ 7.

[193]*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

federal habeas, deference does not imply abandonment or abdication of judicial review.

Deference does not by definition preclude relief. A federal court can disagree with a state court's

credibility determination and, when guided by AEDPA, conclude the decision was unreasonable

or that the factual premise was incorrect by clear and convincing evidence."[194]

After a careful examination of the record, the Court cannot find that the trial court's

factual finding, that race was not an issue in the case, was objectively unreasonable in light of the

evidence presented in the state-court proceeding. In a sworn affidavit, trial counsel stated that:

> To the best of my recollection, the issue of race was not discussed
> with the panel during jury selection. Race simply was not an issue
> in the case. The events of the shooting were not racially motivated,
> nor had the alleged crime occurred in a racially charged
> atmosphere. There was no press coverage to indicate any possible
> bias, concern, or issue regarding race in the community.[195]

The trial judge was in the best position to evaluate credibility and demeanor.[196] The Court

concludes that Petitioner has not come forward with clear and convincing evidence to overcome

the presumption that the trial judge's factual determinations were correct, and therefore accepts

as true that race was not an issue in Petitioner's trial. Because the issue of racial bias was

irrelevant to the case, the Court concludes that counsel was not ineffective for choosing not to

question the prospective jurors on that issue.[197]

---

[194] *Id.*

[195]*Ex parte Ford* at 348 ¶ 5.

[196]*See Miller-El*, 537 U.S. at 339 (as with the evaluation of a juror's state of mind, the evaluation of counsel's state of mind based on demeanor and credibility lies peculiarly within the trial judge's province; deference is necessary because a reviewing court , which analyzes only the transcripts from voir dire, is not as well-positioned as the trial court to make credibility determinations).

[197]*See Flores v. Dretke*, 2003 U.S. App. LEXIS 21976, *10 (5th Cir. Oct. 28, 2003) (failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of

Further, even if Petitioner could establish that the crime was racially motivated or had

occurred in a racially charged atmosphere, the Circuit's holding in *Moore* makes clear that this

type of generalized allegation, alone, is not sufficient to show that counsel performed deficiently

by choosing not to question the prospective jury members about racial bias.[198]  Moreover,

assuming that Petitioner could meet the first prong of *Strickland* by showing that counsel's

performance fell below an objective standard of reasonableness, he still must demonstrate that

counsel's deficient performance actually prejudiced the outcome of his trial.  The Court

concludes that Ford has done no more than speculate that there *might* have been undetected racial

bias at work in the trial and sentencing, without presenting any evidence to support his argument.

**The Court accordingly concludes that Ford's eighth claim of error lacks merit under the**

**AEDPA.**

### H.     *Claim Nine:  Appellate counsel provided ineffective assistance by failing to challenge the dismissal for cause of prospective Juror Johnson.*

The prosecution successfully challenged Juror Tita Casundra Riley Johnson for cause.

He argues appellate counsel was ineffective for failing to challenge Johnson's exclusion,

because, although she did express certain conscientious scruples against imposing the death

penalty, Johnson in the end stated that she could follow the law and impose the death sentence if

the prosecution made a sufficient case for that penalty.  Thus, Ford argues, Johnson was not

properly excluded under *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  *Wainwright* provides:

---

reasonableness); *McClellan v. Cockrell*, 2003 U.S. Dist. LEXIS 17385, *21 (N.D. Tex Sep. 3, 2003)
(citing *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995) (counsel is not required to make
frivolous objections, arguments, or motions).

[198]*See Moore*, 819 F.2d at 520.

> The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. We note that . . . this standard . . . does not require that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen cannot simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.[199]

The trial court made a factual finding that Johnson was properly excused because she was unable to follow the applicable law.[200] The Court has reviewed the record and finds that it supports the factual finding and in any event was not unreasonable. Johnson presented the dilemma of the vacillating juror. Given the particular deference given to a trial court's determination of juror bias, the record's support of the findings, and the absence of any clear and convincing evidence to the contrary, the Court cannot say that appellate counsel was ineffective for raising a claim on which it would almost surely lose. **The Court concludes that Ford's ninth claim of error lacks merit under the AEDPA.**

I.    ***Claim Ten: Jury misconduct deprived Ford of both due process of law and the Sixth Amendment right to confront the evidence used against him in open***

---

[199]*Id.; see Mcfadden v. Johnson*, 166 F.3d 757, 758 (5th Cir. 1999).

[200]*See Ex parte Ford* at 381-82, 385.

***court.***

Based on his investigator's post-trial interview of the jury foreman, Ford states that two jurors at his trial told the other jurors that they had been shot at and that they would never forget the face of the person who shot at them.[201] He claims that the unidentified jurors' alleged statements "interjected non-record evidence into the jury's deliberations on the central matter in dispute."[202] The introduction of non-record evidence, Ford argues, denied: (1) his due process right to trial before an impartial jury who would consider only the evidence presented in the courtroom and admitted into evidence; and (2) his Sixth Amendment right to confront the evidence against him.[203] Respondent argues that the state habeas court found that no juror misconduct occurred and that Ford has presented no factual basis for the claim.[204] Ford replies that the state habeas court's decision represented an unreasonable application of clearly established federal law and that this Court should not defer to it.[205]

The Court concludes that Ford's claim fails in the most basic respect. As discussed earlier in the context of his Brady claim, Ford has here again utterly failed present the state habeas court with any evidence suggesting that any basis in reality existed for the hearsay within hearsay statement. Setting aside the issue of whether statements of opinion, based on a juror's personal experience and made during jury deliberations, can support a claim that the jury was somehow tainted by outside evidence, the Court notes that Ford's argument fundamentally

---

[201]*See* Am. Pet. at 47; *see* Pet'r Ex. 23.

[202]*See* Am. Pet. at 47.

[203]*See id.*

[204]*See* Resp't Orig. Answer at 32.

[205]*See* Pet'r Reply to Resp't Orig. Answer at 49.

depends upon whether one or more of the jurors ever actually made such statements.  Ford

himself concedes as much in his argument:  "*If* two jurors' experiences were communicated

generally to other jurors during deliberations, prior to the time there was unanimity as to guilt,

and these experiences *were* acknowledged or discussed, this misconduct was prejudicial."[206]

However, Ford presents only rank hearsay within hearsay to suggest that anyone on the jury ever

actually made the statements about which Ford complains.  The Court concludes that the state

habeas court's rejection of Ford's claim was not inconsistent with, nor an unreasonable

application of, clearly established federal law concerning juror misconduct, nor based on an

unreasonable determination of the facts from the evidence before it.  **Accordingly, the Court**

**concludes that Ford's tenth claim lacks merit under the AEDPA.**

## V.   CERTIFICATE OF APPEALABILITY

The AEDPA converted the "certificate of probable cause" that was required as a

prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a

Certificate of Appealability ("CoA").[207]  The CoA requirement supersedes the previous

requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed

after the effective date of the AEDPA.[208]  Under the AEDPA, before a petitioner may appeal the

---

[206]Pet'r Reply to Resp't Orig. Answer at 50 (citation omitted) (emphasis added).

[207]*See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997), (recognizing that the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); and *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997), (holding that the standard for obtaining a CoA is the same as for a CPC).

[208]*See Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); and *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).

denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA.[209]

Under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA

is granted.[210]  In other words, a CoA is granted or denied on an issue-by-issue basis, thereby

limiting appellate review to those issues on which CoA is granted alone.[211]

A CoA will not be granted unless the petitioner makes a substantial showing of the denial

of a constitutional right.[212]  To make such a showing, the petitioner need <u>not</u> show that he will

prevail on the merits but, rather, demonstrate that reasonable jurists could debate whether (or, for

that matter, agree that) the petition should have been resolved in a different manner or that the

issues presented are adequate to deserve encouragement to proceed further.[213]  This Court is

authorized to address the propriety of granting a CoA *sua sponte*.[214]

The showing necessary to obtain a CoA on a particular claim depends upon the manner in

---

[209]*See Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039 (2003); and 28 U.S.C §2253(c)(2).

[210]*See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002), (holding that a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000), (holding the same); and  *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997), (holding that the scope of appellate review of denial of habeas petition limited to issue on which CoA granted).

[211]*See Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

[212]*See Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603 (2000); and *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394 (1983).

[213]*See Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; and *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4.

[214]*Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

which the District Court has disposed of a claim.  If this Court rejects a prisoner's constitutional

claim on the merits, the petitioner must demonstrate that reasonable jurists could find the court's

assessment of the constitutional claim to be debatable or wrong.[215]  In a case in which the

petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of

constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the

petitioner must show that jurists of reason would find it debatable whether the petition states a

valid claim of the denial of a constitutional right and whether this Court was correct in its

procedural ruling.[216]

The determination of whether an unsuccessful federal habeas corpus petitioner is entitled

to a Certificate of Appealability must be viewed through the prism of the AEDPA's highly

deferential standard of review.  Thus, the issue before this Court when determining whether the

petitioner is entitled to a CoA is not whether reasonable jurists could disagree with this Court's

resolution of the merits of petitioner's claims for relief but, rather, whether reasonable jurists

could disagree with this Court's determination that the state habeas court acted reasonably when

that court denied petitioner's claims on the merits.

---

[215]       "[W]here a district court has rejected the constitutional claims on the
            merits, the showing required to satisfy §2253(c) is straightforward: The
            petitioner must demonstrate that reasonable jurists would find the
            district court's assessment of the constitutional claims debatable or
            wrong."
*Miller-El v. Johnson*, 537 U.S. at 338, 123 S.Ct. at 1040, *quoting Slack v. McDaniel*, 529 U.S. at 484,
120 S.Ct. at 1604.

[216]*Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604, (holding that when a district court
denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a
CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1)
the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural
ruling was correct).

Viewed in proper context, there is no basis for disagreement among jurists of reason regarding this Court's disposition of petitioner's claims herein under the AEDPA. Petitioner's sixth and eleventh claims for relief are each precluded from federal habeas review by the exhaustion of claims doctrine the Supreme Court announced in *Picard v. Conner*[217] and foreclosed by well-settled federal case law. To summarize, Petitioner's attempt to demonstrate cause and prejudice for the procedural default of his sixth or *Brady* claim is utterly unpersuasive and provides no basis for disagreement among jurists of reason. Regarding his eleventh claim, Ford concedes that he did not present it in state court and does not even attempt to show cause and prejudice to overcome the procedural bar to federal habeas review. Moreover, Petitioner presents no evidence, let alone clear and convincing evidence, to overcome the state habeas court's factual determination that there was no jury misconduct.

This Court has independently reviewed all of petitioner's ineffective assistance claims (Claims One, Three, Five, Seven, Eight, and Nine) and concluded not only that none of them satisfy the prejudice prong of *Strickland*, but that all of them also fail to satisfy the deficient performance prong of that same test.[218] Even if there could be disagreement over this Court's

---

[217]404 U.S. 270, 275-76 (1971).

[218]As discussed regarding Ford's first ineffective assistance claim, the state habeas court did not specifically address the issue of deficient performance. Thus, this Court could not determine whether the state habeas court acted reasonably in reaching its conclusion, because that court did not actually reach an ascertainable conclusion. After conducting an independent review, this Court concluded that Ford had not demonstrated deficient performance. If the state habeas court had reached this same conclusion, jurists of reason could disagree with this Court's determination that such a finding would have been reasonable. However, this Court also finds that reasonable jurists could not disagree that the state habeas court acted reasonably when it determined that Ford failed to show prejudice. Because Ford must meet both *Strickland* prongs, the Court concludes that he is not entitled to a certificate of appealability on this claim.

conclusions as to the wholesale lack of merit to any of petitioner's ineffective assistance claims, there can be no reasonable disagreement over the facts that:  (1) the state habeas court applied the correct federal constitutional standard (*i.e., Strickland*) in rejecting petitioner's ineffective assistance claims; and (2) in so doing, the state habeas court applied the *Strickland* test in an objectively reasonable manner.

The Court has similarly reviewed Ford's due process claims (Claims Two and Four) and concluded that there can be no disagreement among jurists of reason that Ford failed to show that the state habeas court, in rejecting these claims, reached a decision contrary to clearly established federal law, unreasonably applied firmly established law, or based its decision on an unreasonable determination of the facts in light of the evidence presented to it.  The Court has reached the same conclusion regarding Ford's tenth claim, raising jury misconduct.

Under such circumstances, the Court concludes that petitioner is not entitled to a Certificate of Appealability with regard to any of his claims for relief raised herein.

Accordingly, it is hereby **ORDERED** that:

1.      All relief requested in petitioner's amended petition for federal habeas corpus relief, filed January 3, 2003[219] is **DENIED**.

2.      Petitioner is **DENIED** a Certificate of Appealability.

---

[219]*See* docket entry no. 31.

3.      All other pending motions are **DISMISSED AS MOOT**.

4.      The Clerk shall prepare and enter a Judgment in conformity with this

Memorandum Opinion and Order.

**SIGNED and ENTERED this** _5_ **day of April, at El Paso, Texas.**

 

**THE HONORABLE DAVID BRIONES**
**UNITED STATES DISTRICT JUDGE**

58